**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Billy Joe SIMPSON, Defendant–**
**Appellant.**

**No. 90–5032.**

United States Court of Appeals,
Tenth Circuit.

Dec. 10, 1991.

Tony M. Graham, U.S. Atty. (Kathryn H. Phillips and Susan W. Pennington, Asst. U.S. Attys., with him on the brief), Tulsa, Okl., for plaintiff-appellee.

James L. Eisenbrandt (Barbara W. Foster, Linde, Thompson, Langworthy, Kohn & Van Dyke, Overland Park, Kan., with him, on the brief), Bryan, Cave, McPheeters & McRoberts, Leawood, Kan., for defendant-appellant.

Before MOORE and BRORBY, Circuit Judges, and JENKINS,* District Judge.

BRORBY, Circuit Judge.

Mr. Simpson appeals his conviction on twenty-six criminal charges, which included one count of conspiracy (18 U.S.C. § 371), twenty-two counts of wire fraud (18 U.S.C. § 1343), and three counts of misapplication of bank funds (18 U.S.C. § 656). Mr. Simpson asserts juror misconduct and error in the instructions relating to fraud, proof of intent, and motive. We affirm.

A bird's eye view of this case is essential to an understanding of the issues. The criminal acts charged all arose out of a scheme to loot a small Oklahoma bank that was principally owned, controlled, and managed by Mr. Simpson. The bank had been operating under a cease and desist order which mandated, among other things, that the bank would maintain certain capital to asset ratios and that its brokered deposits would not exceed a certain level. After attempting for some time to find a buyer for his controlling interest in the bank, Mr. Simpson found Buyers who agreed to purchase his stock for far more than it was worth and who would retain Mr. Simpson as the bank's CEO. Buyers, by using money brokers who were paid exorbitant fees, then caused third parties to deposit funds in the bank. As these

---

* The Honorable Bruce S. Jenkins, Chief Judge, United States District Court for the District of Utah, sitting by designation.

funds were deposited, Mr. Simpson ordered them transferred into Buyers' checking account. Buyers then used these transferred funds to pay Mr. Simpson for his stock, to pay the money brokers far higher than normal commissions, and to pay themselves consulting fees. Buyers and money brokers were codefendants and were likewise convicted.

## I

### Juror Misconduct

Following the guilty verdicts, Mr. Simpson filed a Motion for a New Trial based upon juror misconduct. This motion was supported by two affidavits. The first was executed by the husband of one of Mr. Simpson's defense counsel. This affidavit stated that after the guilty verdicts had been returned and the jury had been discharged, he was in a bar when one of the jurors told him she had seen one of the defendants (Mr. Button, a money broker) in handcuffs early in the trial and that the jurors had discussed it and all knew Mr. Button was in jail. The second affidavit was that of an employee of the bar who corroborated the first affidavit saying she likewise heard the same conversation.

The district court denied the motion holding Mr. Simpson, not Mr. Button, was the principal figure in the conspiracy and concluded there was no authority for the proposition that alleged extraneous information as to one alleged coconspirator taints all other codefendants' convictions. As to the defendant Mr. Button, the district court held that an accidental viewing of a defendant in custody was not per se prejudicial. The district court concluded that an evidentiary hearing inquiring into the effect of any sighting by the jurors was precluded by Fed.R.Evid. 606(b).

■ We review the denial of a motion for new trial based upon juror misconduct for an abuse of discretion. *United States v. Ware*, 897 F.2d 1538, 1542 (10th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 2629, 2630, 110 L.Ed.2d 649, 650 (1990); *United States v. Bruscino*, 687 F.2d 938, 940 (7th Cir.1982), *cert. denied*, 459 U.S. 1211, 1228,

103 S.Ct. 1205, 1235, 75 L.Ed.2d 446, 468 (1983). Whether a district court abused its discretion in denying the motion depends on whether there is a reasonable possibility the extraneous material may have affected the jury's verdict. *Bruscino*, 687 F.2d at 940.

The starting point for our analysis is Fed.R.Evid. 606(b), which provides "a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention," but "a juror may not testify as to ... the effect of anything ... concerning the juror's mental processes in connection therewith."

■ What we have before us is an allegation of extraneous prejudicial information, i.e., the accidental viewing by one or more of the jurors of Mr. Simpson's codefendant in handcuffs. The language of Rule 606(b) allows a juror to testify as to *whether* any extraneous prejudicial information was improperly brought to bear upon a juror. However, the language of the rule is equally clear that a juror may not testify as to the *effect* the outside information had upon the juror. The affidavits filed in support of Mr. Simpson's Motion for New Trial clearly established the existence of the extraneous information. Had one or more of the jurors been called to testify, they could have testified to no more. "The court's questioning of a juror who is the recipient of extraneous information is limited to the circumstances and nature of the improper contact." *United States v. Hornung*, 848 F.2d 1040, 1045 (10th Cir.1988), *cert. denied*, 489 U.S. 1069, 109 S.Ct. 1349, 103 L.Ed.2d 817 (1989). Therefore, it would have been an exercise in futility for the trial court to conduct an evidentiary hearing. The trial court properly denied Mr. Simpson the opportunity for an evidentiary hearing on his motion for a new trial based upon extraneous juror information.

■ This does not end our inquiry. Under Rule 606(b), we still must assess whether the extraneous information was prejudicial to the defendant. Normally, we would do this " 'by reviewing the entire record, analyzing the substance of the ex-

trinsic evidence, and comparing it to that information of which the jurors were properly aware.'" *Hornung,* 848 F.2d at 1045 (quoting *United States v. Weiss,* 752 F.2d 777, 783 (2d Cir.), *cert. denied,* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985)). Where an extraneous influence is shown, the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror. *United States v. Bassler,* 651 F.2d 600, 603 (8th Cir.1981) (district court properly conducted an objective inquiry into the effect of extraneous influence on the jury), *cert. denied,* 454 U.S. 944, 102 S.Ct. 485, 70 L.Ed.2d 254, 454 U.S. 1151, 102 S.Ct. 1018, 71 L.Ed.2d 305 (1982). The inquiry is whether there exists a reasonable possibility that the external influence or information affected the verdict. *Bruscino,* 687 F.2d at 940; *Paz v. United States,* 462 F.2d 740, 746 (5th Cir.1972). Certain types of extraneous juror information create a rebuttable presumption of prejudice which the government must overcome. *See, e.g., Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954); *Hornung; United States v. Day,* 830 F.2d 1099 (10th Cir.1987); *Government of Virgin Islands v. Gereau,* 523 F.2d 140 (3d Cir.1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976). However, the case before us does not fall into this latter category.

■ We need not perform this analysis, however, as this circuit, as well as many others, has held that an isolated view by jurors of a defendant in handcuffs does not justify a new trial in the absence of a showing of actual prejudice. *United States v. Johnson,* 911 F.2d 1394, 1397 (10th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 761, 112 L.Ed.2d 781 (1991); *Ware,* 897 F.2d at 1542; *United States v. Halliburton,* 870 F.2d 557, 562 (9th Cir.), *cert. denied,* 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 575 (1989); *United States v. Carr,* 647 F.2d 867, 868 (8th Cir.), *cert. denied,* 454 U.S. 855, 102 S.Ct. 303, 70 L.Ed.2d 149 (1981); *Glass v. United States,* 351 F.2d 678, 681 (10th Cir.1965); *Hardin v. United States,* 324 F.2d 553, 554 (5th Cir.1963).

In assessing the reasonable possibility that seeing defendant Mr. Button in handcuffs affected the jury's verdict, we note the defendant here complaining of this incident is not Mr. Button, but rather Mr. Simpson. Mr. Button elected not to testify. We cannot accept the premise that a juror might have convicted the remaining defendants on the theory that if Mr. Button was bad enough to be handcuffed and in custody, the remaining defendants must in some way be guilty.

Mr. Simpson cites to us *Johnson* and *Ware,* wherein a juror in an isolated incident had seen the defendant in handcuffs and in both cases the district court had interrogated the juror to determine whether the juror could remain impartial. Mr. Simpson contends these cases require an evidentiary hearing. In both these cases the jurors had neither rendered a verdict nor been discharged. We note Rule 606(b) applies only "[u]pon an inquiry into the validity of a verdict." In *Johnson* and *Ware,* Rule 606(b) did not apply because the trial court was inquiring about possible juror taint *prior to* the verdict. In the case before us, a verdict had been rendered; therefore Rule 606(b) controls.

■ When a jury has accidentally seen a defendant in handcuffs in an isolated incident, when the jury has been discharged, and when a codefendant can assert nothing more than the possibility of prejudice, it is not an abuse of the trial court's discretion to deny an evidentiary hearing and to deny a motion for new trial based upon extraneous juror information. The trial court's denial of Mr. Simpson's motion for a new trial was an appropriate exercise of the court's discretion.

## II

■ Mr. Simpson argues that four instructions given by the trial court were either inaccurate statements of the law or were confusing or misleading to the jury. When examining a challenge to jury instructions, we review the record as a whole to determine whether the instructions accurately state the governing law and whether

they provided the jury with an ample understanding of the issues and the applicable standards. *Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1271 (10th Cir.1988). We shall examine each challenged instruction separately.

A. *Money or Property:*

Mr. Simpson argues that under *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (holding the mail fraud statute does not protect an intangible right), and *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (extending *McNally* to the wire fraud statute), it would be improper to allow a jury to convict by finding an intent to defraud the bank of its "custody" or of its "right to make its own decisions" about the funds involved, which was what the trial court instructed.

■ We first examine the evidence before the jury. The object of the scheme was to attract to the bank brokered funds from third persons. This was accomplished. Once the funds were received by the bank, the funds were owned by the bank and were the property of the bank. When these funds were transferred into Buyers' account, the bank was denied ownership of these funds and benefits therefrom, which included the custody of the funds and the right to make its own decision, i.e., to invest and receive interest, concerning these funds.

The trial court instructed the jury that Mr. Simpson need not derive any personal benefit from the misappropriation nor need there be a loss to the bank in order for an individual to be found guilty of wire fraud. The jury could convict, instructed the court, if "the Bank was defrauded of something, which may include being defrauded of its right to have custody of the funds, or of the right to make its own decisions as to how these funds were to be used." [1]

■ The instruction given was not a model of clarity to be followed. The phrase "defrauded of something" is not, standing alone, a precise statement of the law. This phrase, however, was modified to include the "right to have custody of the funds" and "the right to make its own decisions as to how these funds were to be used." In *Carpenter*, 484 U.S. at 28, 108 S.Ct. at 321–22, the Supreme Court concluded that a scheme to trade upon the victim's confidential information was a "property right" within the purview of the wire fraud statute. A conspiracy to defraud the victim of the use or control of his money is also within the purview of the wire fraud statute. The terminology employed by the trial court, i.e., "custody of the funds" and "right to make its own decisions as to how these funds were to be used," clearly encompasses only property rights. The scheme to defraud was intended to deprive the bank of its money or at least the right to use this money. A scheme where the accused intends to gain money or property at the expense of the victim is clearly within the purview of the wire fraud statute. *United States v. Stewart*, 872 F.2d 957, 960 (10th Cir.1989).

We have reviewed the indictment (wilfully devise a scheme to defraud and to obtain money and property by false pretenses), the remaining instructions (essential element to convict of wire fraud is to defraud of money or property), and the evidence in this case (the bank was deprived of at least the use of its money), and we conclude there was no possibility the jury convicted Mr. Simpson without finding the scheme was intended to deprive the bank of money or property.

B. *Intent:*

■ The trial court instructed the jury as follows:

1. The instruction in its entirety is as follows:
   An individual may be guilty of wire fraud in violation of Title 18, United States Code, Section 1343, even though he does not derive any personal benefit from the misappropriation.
   The Government does not have to show that there was a permanent loss to the bank. Nor

would repayment constitute a defense to the charges, if there has been a willful fraud.
   The test is whether the Bank was defrauded of something, which may include being defrauded of its right to have custody of the funds, or of the right to make its own decisions as to how these funds were to be used.

Intent may not ordinarily be proved directly because there is no way of fathoming or scrutinizing the operations of the human mind. However, you may determine a defendant's intent from the surrounding circumstances. You may consider any facts and circumstances in evidence which indicate the defendant's state of mind. It is ordinarily reasonable to determine that a person intends the natural and probable consequence of acts knowingly done or knowingly omitted.

Mr. Simpson asserts the last sentence of this instruction improperly shifts the burden of proof from the Government to Defendant. Mr. Simpson cites to us *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) and its progeny.

The challenged instruction is similar to the instruction upheld in *United States v. Ogle,* 613 F.2d 233 (10th Cir.1979), *cert. denied,* 449 U.S. 825, 101 S.Ct. 87, 66 L.Ed.2d 28 (1980), which stated: "[I]t is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted." *Id.* at 242. In *Ogle,* we discussed *Sandstrom* and distinguished it observing: "To allow the jury to pursue a deductive process on a permissive basis is far different from advising the jury that the law *presumes* that a person intends the ordinary consequences of his voluntary acts. The latter form reverses the burden of proof, the former does not." *Id.* at 243. The same principles are applicable here. The challenged instruction did not shift the burden of proof.

### C. *Motive:*

■ The trial court instructed the jury as follows:

The requirement that a defendant intended to injure or defraud the financial institution may be shown by a knowing, voluntary act by the defendant, the natural tendency of which may have been to injure the financial institution even though such may not have been the defendant's motive. It is not required that the defendant have any evil desire or motive of causing injury to the financial institution. A defendant may be found to have willfully misapplied funds of the institution even if he was motivated purely by his own self interest or that of another and wishes no harm to anyone.

The trial court further instructed the jury:

To act with "intent to defraud" means to act willfully, and with the specific intent to deceive or cheat, ordinarily for the purpose of either causing some financial loss to another or bringing about some financial gain to oneself. While intent to defraud a bank is not an essential element of the offenses charged, this intent requirement does not mean that the motive of a defendant must have been to injure or defraud the bank; the intent may be show[n] by an unlawful act voluntarily done, the natural tendency of which may have been to injure the bank.

The evidence in the case need not establish that the bank was actually defrauded, but only that the accused acted with the "intent to defraud."

An act is done "willfully" if done voluntarily and intentionally and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.

Mr. Simpson argues these two instructions had the effect of confusing the jury and of eliminating the requirement of specific intent. Specifically, Mr. Simpson argues the word "motive" should be eliminated from the instructions. He asserts that "intent" and "motive" are two different things and evidence of "motive" is not relevant to proof of the "intent" element of 18 U.S.C. § 656.

The trial court gave three instructions that clearly and precisely instructed the jury concerning specific intent. These instructions were entitled "Intent to Defraud," "Specific Intent," and "Good Faith Defense to Charge of Intent to Defraud." Mr. Simpson makes no claim that any or all of these instructions were defective in whole or in part. The trial court also gave three instructions dealing with motive. Mr. Simpson cites only two. The third instruction concerning motive, to which Mr.

Simpson does not complain, was entitled "Motive." There the trial court explained the difference between motive and intent. This instruction reads in part as follows:

> Intent and motive should never be confused. Motive is what prompts a person to act or fail to act. Intent refers only to the state of mind with which the act is done or omitted. Personal advancement [and] financial gain are two well recognized motives for much of human conduct. These motives may prompt one person to voluntary acts of good and others voluntary acts that are criminal. Good motive alone is never a defense where the act done or omitted constitutes a crime. So the motive of the accused is immaterial, except insofar as evidence of motive may aid in determining the state of mind or intent.

Some courts have criticized motive instructions as unnecessary and confusing. *See, e.g.,* Hon. Edward J. Devitt & Charles B. Blackmar, *Federal Jury Practice & Instructions,* § 14.11 (3d ed. Supp.1990). Other courts find motive instructions helpful to inform the jury that evidence of the defendant's purpose is not a defense but may be considered in determining the element of intent. *See United States v. Richmond,* 700 F.2d 1183, 1196 (8th Cir.1983). An examination of all the instructions in the present case leads us to conclude that the concepts of motive and intent were properly differentiated. The motive instructions as given do not constitute reversible error.

In summary, we conclude the trial court properly denied Mr. Simpson's motion for new trial and properly instructed the jury.

The judgment is AFFIRMED.