**PORT TERMINAL & WAREHOUSING COMPANY and McKinney International Forwarders, Inc., Plaintiffs,**

v.

**JOHN S. JAMES CO., D. J. Powers Company, Inc., Frederick Richards of Georgia, Inc., Frederick Richards, Inc., Thomas C. James, William Earnest Carter, and James P. Black, Defendants.**

No. CV480–028.

United States District Court,
S. D. Georgia,
Savannah Division.

Nov. 13, 1981.

W. Brooks Stillwell, III, Arnold C. Young, Leonard J. Panzitta, with Hunter, Houlihan, Maclean, Exley, Dunn & Connerat, P. C., Savannah, Ga., J. Thomas Whelchel, Dickey, Whelchel, Miles & Brown, Brunswick, Ga., Charles B. Mikell, Jr., Savannah, Ga., Harold H. Clokey, Overland Park, Kan., for plaintiffs.

Walter C. Hartridge, II, John Gregory Odom, Bouhan, Williams & Levy, Kathryn McCoy. Aldridge, Remler & Henderson, Charles Rippin, Savannah, Ga., Lloyd C. Caudle, Charlotte, N. C., for defendants.

## ORDER

B. AVANT EDENFIELD, District Judge.

Before the Court is a motion for new trial made by defendants William Earnest Carter, Thomas C. James, D. J. Powers Company, Inc. and John S. James Company.

### I. *The Case So Far*

This antitrust action was tried in this Court before a jury beginning on March 16, 1981. On March 24th the jury returned a verdict in favor of the plaintiffs and against all defendants in the amount of $158,500. This verdict was trebled to $475,-500.00, as required by law, and, after deductions of amounts plaintiffs had received in settlement prior to trial, judgment was entered on March 30th in the amount of $353,-000. Subsequently, on June 22, 1981, the Court awarded plaintiffs' attorneys' fees and costs in the amount of $141,167.34.

Furthermore, on June 5th the Court entered a permanent injunction against all defendants after making findings of fact and conclusions of law supporting the necessity of such injunctive relief. No defendants moved the Court to reconsider any of its Orders during the appropriate periods, and no timely motion for new trial was made. All defendants have appealed this action to the Fifth Circuit Court of Appeals except for defendants Frederick Richards, Inc., Frederick Richards of Georgia, Inc. and James P. Black which have agreed to settlement with plaintiffs subsequent to trial.

On April 13, 1981, the plaintiffs' attorney, W. Brooks Stillwell, III, reported to the Court that information had come to his attention indicating that there may have been an attempt by one of the defendants to influence the jury during the course of the trial.

The information came to light as follows: On April 10, 1981, Mr. McKinney, president of both plaintiff corporations, was in the bar of the Hyatt Regency Hotel in Savannah with his friend, Brenda Solomon. They were approached by Kenneth Rawlings who had served on the jury in the case. Mr. Rawlings told Mr. McKinney that he had been approached by Dick Hearn, Jr., whose father had testified as an expert witness for the defendants. The approach had been made, according to Mr. Rawlings, through his own father. Mr. Rawlings told Mr. McKinney that he had been offered $5,000 and later $10,000 to influence his behavior as a juror. Mr. Rawlings believed that defendant Thomas James was the source of this offer. Mr. McKinney immediately informed his attorney, Mr. Stillwell. Mr. Stillwell immediately brought the matter to the attention of the Court.

The Court ordered an FBI investigation and on May 29th met with counsel for all remaining parties to inform them of the information received by the Court. The Court solicited written suggestions from all counsel on how to proceed. After receiving these suggestions of counsel, the Court ordered a post-trial hearing and subpoenaed all members of the jury, including alternates, in addition to all other persons that the FBI investigation indicated might have any knowledge whatsoever of the alleged misconduct. The Court further requested that counsel submit proposals for the conduct of the hearing and proposed questions to be propounded to those persons testifying at the hearing. The Court originally instructed counsel not to discuss this matter outside their respective law firms even with their clients. This was done in order to prevent any further communication between the parties and the witnesses.[1] Several hours before the first hearing took place, counsel were informed that they might consult with their clients. On June 18th and 22nd, 1981, the post-trial hearing was held. The proceedings, at which counsel for all parties were involved, were meant to strike a balance between the needs of the truth-finding process and the necessity of avoiding juror harassment, on the one hand, and affording to defendants the opportunity for participation as guaranteed by the decision in *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). *See also United States v. Moten*, 582 F.2d 654 (2nd Cir. 1978); *United States v. Winkle*, 587 F.2d 705 (5th Cir. 1979). The record of the proceedings was sealed and all witnesses were ordered not to discuss the proceedings. The Court gave these directions because two important witnesses, Mr. Shuman and Mr. Hearn, Sr., were not present on June 18th and the Court tried to ensure that their testimony would not be influenced by the testimony of others. These witnesses were questioned on June 22, 1981. Since no further factual developments were forthcoming, on October 8th the Court unsealed the record and lifted all restrictions except that counsel were ordered not to contact any former jurors.

---

1. Mr. Remler, counsel for defendants, informed the Court at the first meeting with counsel that he had informed his clients that the meeting probably concerned allegations of jury tampering. In addition, Mr. James and Hearn, Sr. had already discussed the FBI investigation at that time.

Mr. Remler later informed the Court that, after conducting his own investigation, he saw no need to present any additional evidence.

## II. *Findings of Fact*

Juror Rawlings testified that his father, Ed Rawlings, had telephoned him during the trial and informed him that Dick Hearn, Jr. had talked to him. Ed Rawlings had asked Juror Rawlings if his mind could be changed about the trial and said that it could be worth something to him if he could. Ed Rawlings mentioned the name of Tommy James and Kenneth Rawlings understood that he was being asked to change his mind in favor of Mr. James. Juror Rawlings testified that he did not take this offer seriously and dismissed it from his mind.

A few days later on Saturday during the trial, Juror Rawlings visited his father. Ed Rawlings told Juror Rawlings that he had had a later conversation with Dick Hearn, Jr. and that Mr. Hearn had said it might be worth $5,000 or $10,000 to "go their way." Juror Rawlings believed that his father was honestly relaying an offer but he did not consider it seriously. Both of them laughed about the offer. Juror Rawlings told Juror Shuman about the first conversation with his father. They laughed about it. Both Juror Rawlings and Juror Shuman testified that their verdict was not influenced in any way by the reported offer. Both men stated that they had not notified the Court because Mr. Rawlings had no proof. Juror Rawlings also told Mr. McKinney during their conversation at the Hyatt that he could prove nothing because there were "too many links in the chain."

Dick Hearn, Jr.'s version of events was somewhat different. He testified that he had known Ed Rawlings through a hunting club to which they had both belonged. He spoke to Ed Rawlings twice during the trial. The first conversation occurred at a fish fry sponsored by the hunting club. Dick Hearn, Jr. testified that he asked Ed Rawlings if his son was on the jury. Dick Hearn, Jr. testified that he then told Ed Rawlings that he hoped Ed's son would

treat Dick Hearn, Sr.'s friend, a defendant in the case, fairly since there was a lot of money involved. Ed Rawlings replied that his son was "bullheaded." Dick Hearn, Jr. stated that Ed Rawlings gave him his son's phone number which Mr. Hearn threw away as soon as he left. Dick Hearn, Jr. testified that Ed Rawlings called him a few days later and asked which defendant was Hearn, Sr.'s friend. Hearn, Jr. answered that the friend was Tommy James. Dick Hearn, Jr. also testified that Ed Rawlings had a drinking problem and that he regarded himself as something of a sharp trader.

Dick Hearn, Jr. evidently intended by the thrust of his testimony to indicate that his contact with Ed Rawlings consisted only of an innocently made remark, occurring in casual social conversation and which was misunderstood by Ed Rawlings and passed on to his son. The testimony of Ed Rawlings was unavailable due to his apparent suicide approximately a week before the hearing. The Court has no reason to connect Ed Rawlings' death to these matters. Juror Rawlings testified to his belief that these matters were not involved in his father's death although the family had not arrived at an explanation for Ed Rawlings' death.

Additional facts were developed at the hearing which do not lend support to the gloss placed on events by Dick Hearn, Jr.'s testimony—that any bribery attempt was a figment of Ed Rawlings' imagination.

In the first place, Dick Hearn, Jr. initiated the conversation with Ed Rawlings at the fish-fry. Young Hearn began the conversation about the trial. Young Hearn testified that he felt uneasy about his conversation. The details of the conversation should have alerted Dick Hearn, Jr. that Ed Rawlings understood him to be asking that Juror Rawlings change his mind. Ed Rawlings referred to his son as "bullheaded", a term having reference to a person's refusal or lack of propensity to change his mind. Young Hearn also must have been aware of how his remarks were perceived when Ed Rawlings gave him his son's telephone number. Nor could there have been any mis-

take in young Hearn's mind about Ed Rawlings understanding when Rawlings called Hearn a few days after their initial conversation to verify the identity of Hearn's "friend" who had much money at stake in the litigation. Yet at no point did young Hearn attempt to correct Ed Rawlings' impression.

The notion that Ed Rawlings constructed a bribe offer out of innocently made remarks is further eroded by the evidence regarding how young Hearn came to know that Juror Rawlings was serving on the jury. His father, Dick Hearn, Sr., had mentioned six or seven names on the jury list and asked his son if he knew any of them. Hearn, Jr. stated that he knew Juror Gene Shuman and Ed Rawlings, the father of Juror Kenneth Rawlings. Hearn, Jr. testified that his father questioned him about the kind of juror Mr. Shuman would be.

Dick Hearn, Sr. testified that he knew which names appeared on the jury list because he had seen the list lying on top of the desk of the attorney who represented Messrs. James and Carter and their respective corporations. Mr. Hearn, Sr. was in the office of the attorney to be deposed. He testified that when the attorney left the room for a moment to get his coffee, his eyes fell on the list lying on the attorney's desk. Although he testified that he received no copy of the list and had only "glanced" at the list, a few days later he questioned his son, according to the son's testimony, about six or seven names. The Court finds this testimony not credible. It is impossible to believe that Hearn, Sr. could have glanced at the list and happened to remember six or seven names about which he casually inquired of his son.

In addition, Mr. James Black testified that Mr. Hearn, Sr. had told him during this litigation that "he would do anything for that boy," referring to Tommy James, because his father saved Hearn, Sr.'s life, "or something to that effect." Hearn, Sr. testified that defendant James' father had given him business during a crucial period years ago. Attorney Greg Odom testified that Hearn, Sr. thought it of utmost importance that his name be brought to the jury's attention. Hearn, Jr. testified that he attended the last day of trial at his father's request. Juror Rawlings recognized Hearn, Jr. in the courtroom because "he kept looking at me [Juror Rawlings]."

The Court is not persuaded that any effort to influence the jury was spawned in Ed Rawlings' imagination. Instead, there exists a chain of "glances," and idle conversations that appear to lead back at least as far as Hearn, Sr.

This hearing was not in any way a criminal proceeding. The Court took testimony in this matter to aid it in coming to a decision regarding the grant of a new trial. Whether any jury influencing can be traced to Mr. James is doubtful. In addition to the events described above, there were phone calls during the trial between Mr. James and the Hearns. Testimony regarding these phone calls is conflicting. Hearn, Jr. testified that he had spoken to Mr. James only once during the trial. Mr. James called and asked Hearn, Jr., an electrician, to give him a price for electrical work in the new house he was constructing.

Hearn, Jr. testified that he had not been interested in the job. He also testified that Mr. James had left several messages at the office for Hearn, Sr. to call him. On the other hand, Hearn, Sr. testified that his only contact with Mr. James during the trial was one phone call made by Mr. James to discuss whether he was getting a fair price on his electrical work. Mr. James testified that Hearn, Sr. had left several messages for Mr. James to call. Mr. James testified that his only phone conversation with Hearn, Jr. during the trial was in regard to the trial. He made no mention of electrical work.

The testimony at the hearing makes the Court highly suspicious. Yet, the facts the Court has been able to gather are insufficient to establish by a preponderance of the evidence that Mr. James was aware of, or authorized, or could have discovered through due diligence a plan to influence a juror. There is no hint in the evidence that Mr. Carter acted improperly in any way.

As a factual matter, the Court credits the testimony of Jurors Rawlings and Shuman that these events did not prejudice them against any of the defendants. The Court is convinced that the jurors treated the defendants impartially in reaching a just verdict which was abundantly supported by the evidence.

### III. *Conclusions of Law*

The Court is aware that because this case is already on appeal to the Eleventh, the proper procedure is for this Court to consider whether or not it is willing to grant a new trial, and if so, to indicate this willingness to the Court of Appeals on application for remand. *See, generally*, Wright & Miller, Federal Practice and Procedure: Civil § 2873 (1979 Pocket Part at 42).

### A. *The Standard*

█ The standard to be applied to cases involving third-party contacts with the jurors involve separate analyses of two questions: *Could* the improper conduct have prejudiced the losing party and *did* the improper contact prejudice the losing party. These questions are not always clearly separated analytically.[2] The Third Circuit explained the standard very well in *Government of the Virgin Islands v. Gereau*, 523 F.2d 140 (3rd Cir. 1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323. There, discussing the improper conversation between a juror and a bailiff, the court explained,

> "... [C]ertain types of misconduct possess such a high potential of prejudice that they are considered *prima facie* prejudicial. Remarks by jury attendants to jurors, where those remarks relate to the jury's deliberations are usually of the latter type. [Citation omitted]. Thus, we will assume, as defendants contend, that the government has the burden of proving that Foye's remark to Cappin was not prejudicial."

The court went on to conclude that the government had met that burden.

Indeed, just such a two-tiered analysis was implicit in the Supreme Court's decision in *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1953). That case concerned a criminal prosecution for invasion of income taxes. A juror reported a bribe attempt and the district court conducted an investigation. The district court determined, without any involvement of defense counsel, to proceed. The Supreme Court reversed and remanded. The type of contact which had occurred in the case was "presumptively prejudicial." However, the Court was careful to point out that the presumption was not conclusive. The District Court was directed "to hold a hearing to determine whether the incident complained of was harmful to the petitioner, and if after hearing it is found to have been harmful, to grant a new trial. *Remmer, supra*, 347 U.S. at 230, 74 S.Ct. at 451.

This standard has been clarified by the Fifth Circuit. The decision in *United States v. Howard*, 506 F.2d 865 (5th Cir. 1975) outlines this two-tiered process. In *Howard*, the defendant moved for a new trial on the basis of an affidavit by one of the jurors stating that another juror had pressured the rest of the jury. The juror had stated that the defendant had been in trouble before. The district court denied the motion without a hearing. The Court of Appeals held that the alleged conduct by the juror was not inherently harmless. It remanded to the district court. The Court of Appeals had already determined that the allegations of the defendant did not describe events which were inherently harmless. Essentially, part of the first tier of the two-tiered inquiry had been answered on appeal. This first step is concerned with finding out what happened and assessing the objective possibilities; this tier answers

---

**2.** Most cases the Court has discovered and that the parties have brought to the attention of the Court involve criminal trials. Yet the Court has discovered no case which sets forth the proposition that different standards are applicable to civil cases. Although in a civil case

due process is due the parties rather than the specific constitutional guarantees to a criminal defendant, the Court sees no reason, nor have the cases disclosed one, for applying a different analysis in civil cases.

the question whether the events occurred and *could* have resulted in prejudice. In *Howard*, the district court on remand was to determine first whether the alleged events had occurred. If they had, in light of the Court of Appeals' prior holding that such events could be prejudicial, then the court was to assume prejudice in the form of a rebuttable presumption. The government was then free to rebut this presumption and show that the defendant had not been prejudiced. *Howard, supra*, 506 F.2d at 869.

■ In its decision in *United States v. Winkle*, 587 F.2d 705 (5th Cir. 1979), the Fifth Circuit discussed *Howard* and reiterated the proper standard: "Thus an adequate demonstration of extrinsic influence upon the jury overcomes the presumption of jury impartiality; it shifts the burden to the Government to demonstrate that the influence in question was not, in fact, prejudicial." *Winkle, supra*, 587 F.2d at 714. In that case, the defendant moved for a new trial on the grounds that one of the jurors reported to other members of the jury that a co-defendant who had been present at voir dire but who was not present at trial had pleaded guilty. The court held that the first tier of inquiry disclosed that a colorable showing of possibly prejudicial influence had been made. Recognizing that a presumption of prejudice existed, the court nevertheless held that under the circumstances of the case, the presumption had been rebutted. The court first noted that the information was discussed in the jury room only in relation to one count. Then the court apparently assessed the strength of the case against Winkle in deciding that the presumption had been rebutted:[3] "By contrast, the defendant Winkle was convicted of 19 substantive offenses, the evidence of which, both documentary and testimonial, was not only relatively discrete but damning." *Winkle, supra*, 587 F.2d at 715. Thus, the strength of the evidence against

the losing party is a factor which may be considered by the Court in assessing actual prejudice.

■ A presumption is a legal device which operates in the absence of other proof to require that certain inferences be drawn from the available evidence. As the Supreme Court recently explained: "This evidentiary relationship between the presumption created by a *prima facie* case and the consequential burden of production placed on the defendant is a traditional feature of the common law. 'The word "presumption" properly used refers only to a device for allocating the production burden.' F. James & G. Hazard, Civil Procedure § 7.9, at 255 (2nd ed. 1977) (footnote omitted). See Fed.Rule Evid. 501. See generally 9 Wigmore, Evidence § 2491 (3rd Ed. 1940). Cf. J. Maguire, Evidence, Common Sense and Common Law, 185–186 (1947)."

■ The operation of a presumption does not mean that a certain standard of proof is applicable. In the case at bar there was very credible evidence rebutting the presumption of prejudice. Thus, the presumption disappears and the fact-finder is left to weigh the evidence and draw conclusions from it.

There is some language in the cases indicating that a particular burden of proof, rather than a presumption, is involved in cases which evaluate the necessity for a new trial. For example, in *Paramount Film Distributing Corp. v. Applebaum*, 217 F.2d 101, 105 (5th Cir. 1954) the Fifth Circuit stated that an evaluation of the effect of outside influences on the jury "does not require a positive finding that the jury was actually influenced by what took place; but rather involves a determination as to whether or not it was made reasonably certain that they were not." The case concerned a civil action for monopolization. Interestingly, later cases, such as *Winkle*,

---

**3.** The Court notes that the case at bar, like *Winkle*, is not one in which the relevant extrinsic influence is so egregious that prejudice must be inferred as in *Stimack v. Texas*, 548 F.2d 588 (5th Cir. 1978) (caller identifying himself as defense counsel told jurors that they would be killed by the Mafia if defendant was convicted). Instead, the facts are reminiscent of those in *Remmer* which the Supreme Court declared were not prejudicial *per se*.

do not mention a standard of reasonable certainty.

Applying the above standards, in addressing the first tier of the analysis—the objective stage—I find that the factual showing made is sufficient to invoke the presumption of prejudice. Juror Rawlings was approached through his father and related the approach to Juror Shuman. These facts *could* prejudice the defendants. However, in addressing the second tier of the analysis, I conclude that the defendants were not prejudiced. I base this conclusion on my opportunity to observe the trial and the jurors, as well as on the testimony at the post-trial hearing. As the Third Circuit in *Government of the Virgin Islands v. Gereau*, 523 F.2d 140, 145 n. 12 (3rd Cir. 1975), remarked, " 'Credibility involves more than demeanor. It apprehends the over-all evaluation of testimony in the light of its rationality or internal consistency and the manner in which it hangs together with other evidence.' *Carbo v. United States*, 314 F.2d 718, 749 (9th Cir. 1963); *Indiana Metal Products v. N. L. R. B.*, 442 F.2d 46, 52 (7th Cir. 1971)." The proposal had no effect on either juror and the defendants were not prejudiced. The Court does not regard this conclusion as a close question and further notes that it is reasonably certain that no prejudice occurred. This conclusion is bolstered by the weight of the evidence presented at trial as was the Fifth Circuit's decision in *Winkle* bolstered by the weight of the evidence. The Court bases no part of its determination on the possibility that any defendant was involved in any bribe attempt or could have discovered any such attempt through due diligence. The evidence does not support such a conclusion; therefore, the analysis set out in *United States v. Jones*, 597 F.2d 485 (5th Cir. 1979), is inapplicable.

B. *The Jurors' Testimony*

Since the Court relies heavily on the testimony of Jurors Rawlings and Shuman, it is necessary to address the propriety of questioning them concerning the extrajudicial contact. As the Third Circuit in *Government of Virgin Islands v. Gereau*, 523 F.2d 140 (3rd Cir. 1975) explained, the mental processes of the jury in arriving at a verdict may not be inquired into. The rule is often explained in language stating that a juror may not impeach his own verdict. As the Third Circuit stated, "the rule was formulated to foster several public policies: (1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; (2) encouraging free and open discussion among jurors; (3) reducing incentives for jury tampering; (4) promoting verdict finality; (5) maintaining the viability of the jury as a judicial decision-making body. *McDonald [v. Pless*, 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915)]; *United States v. Dioguardi*, 492 F.2d 70 (2nd Cir.), *cert. denied*, 419 U.S. 829 [, 95 S.Ct. 49, 42 L.Ed.2d 53] (1974); *Miller v. United States*, 403 F.2d 77 (2nd Cir. 1968) . . . . " The court went on to say that as the rule evolved it was interpreted to forbid reception of a juror's evidence only where it was offered " 'to show matters which essentially inhere in the verdict itself.' *Hyde v. United States*, 225 U.S. 347, 384 [, 32 S.Ct. 793, 808, 56 L.Ed. 1114] (1912)." [Additional citations omitted]. *Id.* The mental processes of a juror or jury in reaching a verdict may not be inquired into. *Capella v. Baumgartner*, 59 F.R.D. 312, 315 (S.C.Fla.1973). In addition to the policy reasons set out above, there are evidentiary reasons for the rule that jury deliberations may not be examined. Professor Wigmore discusses both the parol evidence rule and the privilege accorded communication among deliberating jurors as bases for excluding testimony about jury deliberations. J. Wigmore, *Evidence*, § 2346 (McNaughton ed. 1961). However, it is universally agreed that a juror may testify as to the existence of an extraneous influence. *See, e. g., Mattox v. United States*, 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892). This distinction between the courts' acceptance of juror testimony regarding the existence of an extraneous influence and their rejection of testimony concerning jury deliberations is now embodied in F.R.E. Rule 606(b):

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about what he would be precluded from testifying be received for these purposes."

■ In receiving the testimony of Jurors Rawlings and Shuman, the Court believes that it acted in conformity with the dictates of the law discussed above. No testimony concerning the jury deliberations was given in the hearing. The jurors were questioned only regarding conversations occurring days before the deliberations. The testimony was in regard to the existence of extraneous influences. Both jurors testified that they did not consider the influence attempt seriously. Both testified that they disregarded the influence attempt. Neither testified regarding the jury deliberations. There was no danger that any of the policy concerns enumerated in *Gereau* were compromised by this testimony. The Third Circuit in its decision in *Gereau*, a decision cited with approval by the Fifth Circuit in *Martinez v. Food City, Inc.*, 658 F.2d 369 (5th Cir. 1981), expressly approves a court's consideration of the type of juror testimony received here. The *Gereau* court cited testimony received in *United States v. Brumbaugh*, 471 F.2d 1128 (6th Cir.), *cert. denied*, 412 U.S. 918, 93 S.Ct. 2732, 37 L.Ed.2d 144 (1973) concerning a conversation between a bailiff and juror which is as follows:

"Q. You say he said to you 'For or against?' and you said you did not answer?

"A. I did not answer.

"Q. Then what further followed; any further conversation?

"A. Well, he said that, 'It's always some woman or something holding it up,' to that effect, or something like that, and I still did not answer. I didn't say no more.

"Q. Can you tell me whether this conversation in any way influenced you one way or the other as to your own participation in this case?

"A. No, it did not influence me in any way." *Gereau, supra*, at 154.

The Fifth Circuit in *Winkle, supra*, apparently has considered testimony much closer to the deliberative process itself in upholding a finding of no prejudice: "The jury foreman testified that the fact of Colmar's plea was discussed in relation to the jury's deliberations on that count." *Winkle, supra*, 587 F.2d at 714–715. Similar testimony has been accepted in other Fifth Circuit cases: *United States v. Robbins*, 500 F.2d 650 (5th Cir. 1974) (testimony by jurors as to what was said by one of the jurors during deliberation and testimony by that juror that she was unbiased); *United States v. Nadaline*, 471 F.2d 340 (5th Cir. 1973) (juror testified that his acquaintance with counsel, which he did not disclose on voir dire, had no bearing on his decision in the case).

The Court notes, however, that there is language in some cases which would appear at first glance not to permit such testimony. For example, in *Howard, supra*, the Fifth Circuit states, "Well established case law forbids the eliciting of juror testimony regarding the jury's mental processes, or the influences that any particular evidence had upon the jury's conclusion ... [citations omitted] a juryman may testify to any facts bearing upon the question of the *existence* of any extraneous influence, although not as to how far that influence operated upon his mind." The court further stated, "... the district court must disregard those portions of the affidavit purportedly to reveal the influence the alleged prejudicial extrinsic matter had upon the jurors, and it must

avoid examination concerning any other aspect of the jurors' mental processes." *Howard, supra,* 506 F.2d at 868–9. However, the Court is of the opinion that this language does not forbid the Court from considering the testimony of Jurors Shuman and Rawlings that they were not influenced against the defendants in the case at bar. First, the extraneous influence in *Howard* was a remark by one of the jurors *made in the jury room itself* to the effect that the defendant had been in trouble before. It would be difficult for the fact-finder to investigate actual prejudice in those circumstances without violating the privacy of jury deliberations. Secondly, this language appears to forbid the fact-finder only from inquiring into the influences that went into the verdict. Thus, it would be improper for the Court to inquire into *how* the extraneous influence figured into the verdict, but not improper to hear testimony that the juror was not influenced at all, particularly when the exposure to the possibly prejudicial influence occurred at a time and place remote from jury deliberations. The instructions in *Remmer* were that once a possibly prejudicial incident has been established and the presumption of prejudice is intact, the court must find as a fact whether prejudice occurred. To restrict the court from relying on highly probative evidence, when the consideration of such evidence in no way violates the secrecy of jury deliberations makes no sense. The Court is of the opinion that the testimony of the jurors was properly considered.

#### IV. *Conclusion*

The Court concludes that a possibly prejudicial contact with the jury occurred bringing into play the presumption of prejudice. However, the Court finds that no prejudice occurred. Accordingly, the motion for a new trial is denied.