**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 14 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED  STATES  COURT  OF  APPEALS**

**TENTH  CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

JOHN TERRY BURRIDGE,

      Defendant - Appellant.

No. 98-4077

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 97-CR-158-C)**

C. Bevan Corry, Salt Lake City, Utah, for the Defendant - Appellant.

Scott J. Thorley, Assistant United States Attorney (Paul Warner, United States
Attorney, with him on the brief), Salt Lake City, Utah, for the Plaintiff -
Appellee.

Before **ANDERSON** , **MCWILLIAMS**  and **LUCERO** , Circuit Judges.

**LUCERO** , Circuit Judge.

      Appellant John Burridge brings to us for review his sentence for wire fraud

under 18 U.S.C. § 1343.  His appeal requires us to decide whether, in determining

intended loss under U.S.S.G. § 2F1.1, a district court is required, as a matter of

law, to exclude from the intended loss calculation all funds returned to a fraud victim. We conclude that it is not, and that the calculation of intended loss under U.S.S.G. § 2F1.1 incorporates a determination of the defendant's intent, which is a question of fact for the sentencing court. We exercise jurisdiction pursuant to 28 U.S.C. § 3742(a)(1) and affirm.

**I**

Appellant Burridge served as a like kind accomodator, a position that exists to facilitate transactions under I.R.C. § 1031, which provides for "nonrecognition of gain or loss from   exchanges solely in kind." In the "like kind accomodation transactions" Burridge entered into, a taxpayer would sell a piece of real estate, then enter into an agreement with Burridge, the accomodator. Under the agreement, the taxpayer would give the proceeds of the first transaction to Burridge, who would then hold them until the taxpayer located another piece of real estate for purchase, at which time Burridge would provide the deposited funds to close on the second property. The ultimate objective of like kind accomodation transactions is to enable taxpayers, by not holding the funds themselves, to avoid recognizing capital gains on property sold, treating the series of transactions as an exchange solely in kind under I.R.C. § 1031.

During late 1994 things started to go awry for Burridge. In September, Diane and Leland Tarbox ("the Tarboxes") wired $18,428.53 to Burridge for use

in a like kind exchange pertaining to property in St. George, Utah. In November, the Porter family ("the Porters") wired Burridge a total of $113,832.44 for similar purposes. Finally, in December, Derek Hall gave $2,000 to Burridge as a down payment for yet another transaction. Hall never transferred to Burridge the remaining funds for that transaction.

The government's and Burridge's versions of what happened next vary considerably. It is undisputed, however, that "[c]ontrary to the terms of the Delayed Exchange Agreement and without his victims' authority, Defendant Burridge used portions of the victims' funds to repay the closing proceeds from other real estate transactions. Defendant Burridge also used other portions of the victims' funds without their authority to pay for personal expenses." I R. Doc. 26 at 4 (Statement by Defendant in Advance of Plea of Guilty).

After clients began to demand their funds, Burridge sent misleading facsimiles making excuses for his inability to transmit the funds. When the Porters found a purchase property for their exchange, they requested release of their funds. Burridge failed to release the money, sending deceptive facsimiles to cause delay. Eventually, the Porters took legal action, ultimately seizing Burridge's remaining funds, his home, and recovering additional money from insurance proceeds.

When the Tarboxes found a purchase property, they demanded, in October 1994, the release of their $18,428.53.  Several months later, at closing, Burridge transferred $12,159.53 to the Tarboxes' title company.  The Tarboxes never recovered their additional $6,269.  Hall was unable to contact Burridge and never received any of his money back.

Burridge pleaded guilty to ten counts of wire fraud.  His plea agreement included a promise by the government to seek a sentence at the lower end of the guideline range.  Burridge's plea statement required him to pay $38,628.76 in restitution to his victims, including $2,000 to Hall.  It did not discuss loss calculation for sentencing purposes,     nor was there any explicit discussion of an enhancement for abuse of a position of trust under U.S.S.G. § 3B1.3.  Pursuant to the plea agreement, the government sought that Burridge receive a reduction for acceptance of responsibility and that he be sentenced at the lower end of the applicable guideline range.     At sentencing, the district court concluded that the amount of intended loss attributable to Burridge's conduct was the entire amount entrusted to him in the Porter, Tarbox, and Hall transactions, for a total of "$134,260.97."  IV R. at 5 (Tr., May 5, 1998, Sentencing Hearing).  This resulted in a specific offense characteristic increase of seven levels for an offense involving more than $120,000.     See U.S.S.G. § 2F1.1(b)(1).  Based in part on this loss calculation, an enhancement for abuse of a position of trust, and Burridge's

criminal history category of IV, the district court sentenced Burridge, over his objections, to the guideline range maximum of 33 months of incarceration and 36 months of supervised release.  Burridge appeals his sentence.

## II

U.S.S.G. § 2F1.1 "increases the base offense level for a fraud offense to account for the loss caused by the defendant.  The increase is based on either the actual or intended loss, whichever is greater."  United States v. Banta, 127 F.3d 982, 983 (10th Cir. 1997) (citing U.S.S.G. § 2F1.1, comment (n.8)).  The government bears the burden of proving the amount of loss by a preponderance of the evidence.  See United States v. McAlpine, 32 F.3d 484, 487 (10th Cir. 1994).

"On appeal, '[w]e review the district court's legal interpretation of the guidelines de novo, and review its findings of fact for clear error, giving due deference to the district court's application of the guidelines to the facts.'"  United States v. Ensminger, 174 F.3d 1143, 1145 (10th Cir. 1999) (quoting United States v. Janusz, 135 F.3d 1319, 1324 (10th Cir. 1998)).  "We will not disturb the court's factual findings unless they are without support in the record, or unless 'after reviewing all the evidence we are left with the definite and firm conviction that a mistake has been made.'"  McAlpine, 32 F.3d at 488 (10th Cir. 1994) (quoting United States v. Easterling, 921 F.2d 1073, 1077 (10th Cir. 1990)).

Burridge contends that he never intended to cause any loss to his clients,

and thus the loss for sentencing purposes should be calculated based on the actual net loss they suffered, rather than the entire amount entrusted to him. The Porters' loss, he argues, is $113,832.44 less the $42,000 they recovered from Burridge accounts in their civil suit. [1] The Tarboxes' loss is only $6,269, the amount outstanding after Burridge wired $12,159.53 to their title company. According to Burridge, the district court thus erred in sentencing him based on a loss calculation considering as intended loss all the funds entrusted to Burridge by the Porters, the Tarboxes, and Hall, including those funds wired to the Tarboxes' title company and those recovered by the Porters in their civil suit. We disagree.

## A

The district court did not err in finding the $42,000 recovered by the Porters in their civil suit cognizable as intended loss, because that money was not returned through Burridge's voluntary actions, but rather through action by the victims subsequent to the discovery of the fraud. In Janusz, 135 F.3d 1319, 1324 we confronted a similar challenge to a district court's loss calculation under

---

[1]In his brief, Burridge contends that the Porters' loss is only "$113,309.64, less the $42,000.00 recovered from the Burridge business accounts." Appellant's Br. at 27. The $113,309.64 figure would appear to represent the amount Burridge transferred from the Porters' account to another, not the entire amount entrusted to him by the Porters, which was $113,832.44. While it appears that Burridge may be attempting to claim that $500 of this discrepancy represents a legitimate fee for his services, nowhere is this explicitly argued or adequately explained, and we therefore do not consider it.

U.S.S.G. § 2F1.1. In Janusz, the defendant argued that "the court should have deducted $250,824, which [his victims] recovered from Mr. Janusz's Montessori school account after it was frozen, and amounts [the victims] ultimately recovered from third-party borrowers after his crimes were discovered." Id. We rejected this argument, holding that "[t]he fact that the victims have been able to recover part of their loss after the discovery of the fraud does not diminish Mr. Janusz's culpability and responsibility for purposes of sentencing." Id. (citing United States v. Johnson, 941 F.2d 1102, 1114 (10th Cir. 1991)); United States v. Westmoreland, 911 F.2d 398, 399 (10th Cir. 1990). Janusz also distinguished the restitution calculation, which measures the net amount owed to victims at the time of calculation, from the intended loss calculation, which measures, for sentencing purposes, "the magnitude of the crime at the time it was committed." Janusz, 135 F.3d at 1324. The reasoning of Janusz is equally applicable to the present case.

Burridge argues that the district court erred in disbelieving that he intended to return the Porters' money even before they commenced legal action, but was prevented from doing so by the freezing of his assets. This argument fails as well. The district court's assessment of Burridge's credibility and its ultimate conclusion regarding his intent to return the funds are findings of fact subject only to clear error review. See Ensminger, 174 F.3d at 1145.

The district court could readily have concluded that Burridge's conduct, even if he did intend to return to the Porters an amount equal to that entrusted to him, established a practice of repaying clients by misappropriating other clients' funds. To do so, Burridge essentially sought to "steal from Peter to pay Paul." United States v. Mills, 987 F.2d 1311, 1313 (8th Cir. 1993). Thus the district court had sufficient grounds for concluding that the government had demonstrated Burridge's scheme was intended to cause a loss with respect to the remaining funds—even if the ultimate burden of that loss might eventually fall on another party.

The same reasoning applies to the approximately $12,000 paid out on behalf of the Tarboxes. Given Burridge's pattern of improper withdrawals and shifting of funds, we cannot declare clearly erroneous the district court's factual determination that the government had demonstrated Burridge's intent to misappropriate the entire amount of the Tarbox funds. The fact that the Tarboxes recovered some of their potential losses is not dispositive. We have cited approvingly, in applying U.S.S.G. § 2F1.1 to a bank fraud conviction, the statement that the "defendant's offense level should not turn on whether or not the banks recovered some of their potential loan losses. Rather, the focus for sentencing purposes should be on the amount of the possible loss which [the defendant] attempted to inflict on the banks." United States v. Smith, 951 F.2d

1164, 1169 (10th Cir. 1991) (quoting United States v. Johnson, 908 F.2d 396, 398 (8th Cir. 1990)). In assessing this amount of "possible loss," the district court was in a far better position than are we both to assess the credibility of Burridge's contentions that he intended to make all his victims whole and to assess the amount of loss he attempted to inflict. See Janusz, 135 F.3d at 1324; Smith, 951 F.2d at 1169. The facts can support a conclusion that Burridge intended to cause a loss, if not to the Tarboxes themselves, then to the next victim to pay funds into Burridge's scheme. Cf. Mills, 987 F.2d at 1315-16 (upholding district court's refusal to deduct from intended loss calculation money repaid, prior to entry of criminal charges, to some victims in loss-shifting scheme, but repaid "only reluctantly in response to threats of legal action"). On appeal, we cannot conclude that the district court's decision to find the record indicative of intent to cause loss, and not to credit Burridge's assertion of his intent to repay, was clear error.

Burridge also argues that his history of legitimate like kind accomodation transactions, when combined with his explanations for certain illegal transfers, necessarily defeats the district court's finding that "the record is replete with the evidence of Mr. Burridge making withdrawals from these accounts, transferring the money from one account to another and to another." IV R. at 5-6. On reviewing the record, which includes evidence of impermissible cash withdrawals

as well as transfers which can reasonably be interpreted as demonstrating an intent to conceal funds, we conclude that these factors are insufficient to render clearly erroneous the district court's finding regarding intent. [2]

**B**

Burridge cites to <u>United States v. Smith</u>, 951 F.2d 1164, as requiring a "net loss" approach to his sentencing calculation. This is a mischaracterization. In <u>Smith</u>, 951 F.2d at 1167-68, we held that the net loss approach is limited to calculations of <u>actual</u> loss. [3] We also rejected an intended loss theory, but under circumstances completely distinct from Burridge's. <u>See id.</u> at 1166-69. Smith's fraud consisted of false statements to federally insured banks regarding non-existent down payments by his customers. <u>See id.</u> at 1166. The only intended loss alleged there was the possibility that, if the customers defaulted, the government would lose money by having to pay insurance to the banks. <u>See id.</u> at 1168-69. Thus, we rejected the government's speculative theory in <u>Smith</u> as

---

[2] It would appear that even if the $12,159.53 paid to the Tarboxes' title company was erroneously included as intended loss, such error would have no effect on Burridge's sentence, as it would leave him with a total intended loss of $134,260.97 less $12,159.53, or $122,101.44, an amount sufficient to justify application of the seven-level increase for a loss of more than $120,000 under U.S.S.G. § 2F1.1(b)(1)(H).

[3] Burridge's citation to <u>McAlpine</u>, 32 F.3d at 488-89, is likewise misplaced, as that case, while presenting arguably analogous factual circumstances, involved as a legal matter only the proper calculation of (estimated) actual loss, and did not implicate the calculation of intended loss.

insufficient to support sentencing based on intended loss. See id. at 1169 (rejecting intended loss calculation where "[t]he government has simply failed to offer any support for its calculation").

Burridge's conduct is materially different from the conduct we found insufficient to support application of an intended loss theory in Smith. Burridge pled guilty to fraudulent misappropriation of a portion of his clients' funds, although he now attempts to recharacterize those actions. Only Burridge's own assertion that he meant to return his clients' funds stands against a conclusion that he intended to defraud his clients of the entire amount entrusted to him. While the district judge might have believed that assertion, she could also have rejected it in light of the evidence of Burridge's conduct, and could reasonably have concluded the government had shown by a preponderance of the evidence that Burridge intended to go on improperly withdrawing client funds to support his scheme. Perhaps he might have covered his tracks by shifting funds from new clients, but he would have caused loss to someone all the same. See Janusz, 135 F.3d at 1324; cf. Smith, 951 F.2d at 1169 (rejecting intended loss theory in face of defendants' assertions that he did not intend for anyone to lose money, combined with the fact that any potential loss due to loan default was highly speculative). Therefore, we cannot conclude the district court's finding of intended loss was clearly erroneous.

We also reject the suggestion that the reasoning of United States v. Holiusa, 13 F.3d 1043, 1046-47 (7th Cir. 1994), which concluded that moneys repaid to earlier investors in a pyramid scheme did not reflect intended loss, dictates that we reverse the district court's intended loss calculation. In Holiusa, the money was paid back prior to detection of the scheme. See id. at 1046; see also United States v. Strozier, 981 F.2d 281 (7th Cir. 1992) (including in intended loss money recovered through prompt police intervention). Therefore, the reasoning of Holiusa is entirely inapplicable to the Porters' funds, which were not recovered until after the scheme was discovered.

Holiusa also stated that where return of money is "an integral aspect of [a] scheme," 13 F.3d at 1047, the money returned is not relevant as intended loss. This language, taken in isolation, might support a conclusion the Tarbox funds were improperly included, because Burridge voluntarily released the $12,159.53 in question as part of his scheme. We decline, however, to adopt a strict net loss rule excluding from intended loss all funds returned as part of a pyramid-type scheme. Holiusa makes clear that the full amount of money involved should not be considered "if the defendant both intended to and did return part of that amount before detection of his scheme." Id. at 1046. In contrast to Holiusa, where the money at issue was returned in the regular course of the defendant's scheme, see id. at 1045-46, in this case, there was evidence of personal

- 12 -

withdrawals and of Burridge's "attempting to lull and delay his victims," I R. Doc. 26 at 5, supporting the factual finding that Burridge did not intend to return the money at issue.    We read our own cases as establishing that the determination of a defendant's intent to cause loss is best conducted in light of the particular circumstances of a given case, and not subject to a strict net loss rule such as that applicable to actual loss calculations.    See Smith, 951 F.2d at 1167-68.

### III

Burridge takes issue with the district court's inclusion, in its calculation of loss for sentencing purposes, of the $2,000 loss incurred by Hall in a similar transaction, but one not charged as a count of the indictment.

U.S.S.G. § 1B1.3 provides for inclusion in sentencing as relevant "all acts and omissions committed . . . during the commission of the offense of conviction." U.S.S.G. § 1B1.3(a)(1).  It is undisputed that Hall incurred an actual, not intended, loss.  The question is whether that loss is cognizable, under the Guidelines, as relevant conduct for purposes of Burridge's sentencing on charges arising out of the Tarbox and Porter transactions.  We conclude that it is.

The fact that the Hall conduct was not charged in the indictment is not dispositive.  It is well established that sentencing calculations can include as relevant conduct actions that do not lead to separate convictions.    See, e.g. , United States v. Underwood , 982 F.2d 426, 429 (10th Cir. 1992) (allowing

- 13 -

sentencing based on drug quantities not included in indictment, as "relevant conduct" under U.S.S.G. § 1B1.3). Burridge argues that because he never agreed that his conduct with respect to Hall was criminal in nature, that conduct cannot be held against him in sentencing. Burridge's argument simply ignores the fact that the relevant conduct provisions of the Sentencing Guidelines provide for recognition of conduct not leading to a criminal conviction.

We conclude that the Hall funds were relevant to Burridge's sentencing because they constituted an element of "the same course of conduct or common scheme or plan." Underwood, 982 F.2d at 429. The offense of which Burridge was convicted was wire fraud in his conduct of like kind accomodation transactions. In November 1994, very close in time to the Porter and Tarbox transactions at issue, Burridge received $2,000 from Hall to conduct a similar transaction, and never returned it. Alleged intent to return that money is irrelevant, because it never was returned, and thus is analyzed as actual loss. The conduct is clearly close enough in time and character to make it relevant for sentencing purposes.

Burridge argues that because the district judge stated, during an early stage of the sentencing proceedings, that she was not going to count Hall's loss unless Hall testified, there was insufficient evidence to include Hall's $2,000 in the loss calculation. The judge's statement cannot foreclose her from reaching a contrary

conclusion after further proceedings.  After hearing all the evidence and argument, it was reasonable for the court to conclude, at a later stage of the sentencing proceedings, that the Hall transaction was in fact an element of the same scheme as the offenses of conviction, and therefore cognizable in the sentencing calculation as relevant conduct.    [4]

## IV

Finally, Burridge contests the district court's imposition of a two-level enhancement for abuse of a position of private trust under U.S.S.G. § 3B1.3, which provides that "[i]f the defendant abused a position of public or private trust . . . increase by 2 levels."  "Whether a defendant occupied a position of trust is a factual question that we review for clear error."     United States v. Pappert   , 112 F.3d 1073, 1080 (10th Cir. 1997) (citing     United States v. Queen   , 4 F.3d 925, 928 (10th Cir. 1993)).

As an initial matter, we reject Burridge's argument that the government's failure to discuss the abuse of trust enhancement in the plea agreement forecloses its application in this case.  Apart from the general proposition that silence as to an enhancement does not amount to an affirmative promise to refrain from

---

[4]Given our conclusions regarding the propriety of calculating intended loss based on the Porter and Tarbox funds, it would appear that even were inclusion of the Hall $2,000 improper, exclusion of that money would not reduce the relevant loss below $120,000, and therefore would not affect Burridge's offense level. See U.S.S.G. § 2F1.1(b)(1).

seeking one, the district court noted it would have imposed the abuse of trust enhancement on its own motion even absent the government's initiative.

Burridge essentially argues that because an accomodator does not have a formal fiduciary relationship with his or her clients—precisely because there can be no such relationship if the like kind accomodation transaction is to have its intended tax effect—he does not hold a position of public or private trust within the meaning of the guideline. This argument is without merit. The determination of whether a defendant occupies a position of trust for sentencing purposes does not hinge on whether he or she is technically a fiduciary for purposes of agency law. See United States v. Koehn, 74 F.3d 199, 201 (10th Cir. 1996) (holding U.S.S.G. § 3B1.3 applies where someone uses a "'fiduciary or personal trust relationship'" to commit an offense) (quoting United States v. Brunson, 54 F.3d 673, 677 (10th Cir. 1995)).

We have held, in distinguishing positions of trust which merit application of § 3B1.3 from ordinary arms-length commercial transactions, that "we must carefully distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity, and relationships in which the victim's trust is based on defendant's position in the transaction." Koehn, 74 F.3d at 201.

Assuredly Burridge's was a specialized role, created by the tax code. In

that role, clients entrusted him with their money, to be released when they found properties to purchase.  More to the point, his clients trusted him with their funds neither in reliance on his personality nor because of their credulity, but rather because of his established institutional role in implementing I.R.C. § 1031.  Cf. Koehn, 74 F.3d at 201.  Although not formally created by the tax code, his position is a de facto creation thereof, because the Code necessitates the position to facilitate the tax nonrecognition of capital gains.  We have held that a defendant who occupied a "role as the middleman between customer and financing source" in loan transactions "gained a position of trust with respect to his customers that enabled him to conceal his fraud for long periods of time" and thus merited application of U.S.S.G. § 3B1.3.  Pappert, 112 F.3d at 1080. Burridge's institutional role allowed him to conceal his fraud no less than that of the defendant in Pappert.  Therefore, there are sufficient facts to support the district court's imposition of the enhancement for abuse of a position of private trust.

**V**

Accordingly, Burridge's sentence is **AFFIRMED**.

- 17 -