**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 2 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

   Plaintiff - Appellee,

  v.

RONALD G. SPARKS,

   Defendant - Appellant.

------------------------------------------

UNITED STATES OF AMERICA,

   Plaintiff - Appellee,

  v.

OWEN K. STEPHENSON,

   Defendant - Appellant.

No. 99-6387

(W.D. Oklahoma)

(D.C. No. CR-98-199-R)

No. 00-6242

(W.D. Oklahoma)

(D.C. No. CR-98-199-R)

---

**ORDER AND JUDGMENT** *

---

Before **EBEL**, **ANDERSON**, and **MURPHY**, Circuit Judges.

---

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Defendants Owen Stephenson and Ronald Sparks were convicted following a jury trial on one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371, twenty counts of mail fraud in violation of 18 U.S.C. § 1341, four counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and five counts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957. [1] Both argue that the trial court erred in restricting the testimony of their expert witness and by failing to fully investigate allegations of juror misconduct.

Defendant Stephenson also contends that the trial court erred in sentencing him by incorrectly determining the amount of loss attributable to him for purposes of applying the sentencing guidelines. Finally Defendant Sparks, in a brief submitted pro se, raises numerous additional claims of error which will be addressed below. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND

In the spring of 1996, Defendants were involved with an entity called Americans National Bank Trust ("ANB"). ANB engaged in a private placement

_____

[1]Because Defendants were tried together and their two central arguments on appeal are identical, we have combined their appeals for disposition.

of shares during that same time period. ANB's private placement memorandum, dated April 1, 1996, offered shares in ANB for $1 per share with a 5000 share minimum purchase. Add. at 19. [2] The private placement memorandum stated:

> *"OFF SHORE" BANKING IS NOW AVAILABLE "ON SHORE"*
> *through*
> THE ONLY BANK CHARTER AUTHORIZED
> DIRECTLY BY "THE CONGRESS OF THE UNITED STATES"
>
> "AMERICANS NATIONAL BANK" (ANB) is making a limited offering to a select group of individuals to participate as "FOUNDING SHAREHOLDERS" in the only sovereign bank within the continental united States. These select individuals will not only be part of history, but will earn a **GUARANTEED 100%** return on investment over the next two years.

Id. at 21. Defendants received between $2 and $3 million from investors responding to the ANB offering. Tr. at 94-95.

On November 1, 1996, the California Banking Department filed suit against Defendant Sparks, ANB, other related entities and John Does 1-100 seeking to enjoin them from soliciting money for ANB or any related entities. Add. at 1-10. Defendant Stephenson was not named in the suit, but was deposed in connection therewith and was understood by California officials to be the other person

---

[2]In this opinion, we cite to the trial transcript (Tr. at ___), the transcript of the 7/12/99 Hearing Held in Chambers (Tr. 7/12/99 at ___), the transcript of the 8/19/99 Hearing on Juror Misconduct (Tr. 8/19/99 at ___), the transcript of Defendant Sparks' 10/7/1999 sentencing (Tr. 10/7/1999 at ___), the transcript of Defendant Stephenson's 7/7/2000 sentencing (Tr. 7/7/2000 at ___) and the Addendum to Brief of Plaintiff-Appellee (Add. at ___).

involved with Defendant Sparks in raising money through ANB. Tr. at 96. A temporary restraining order was signed by the court in that case on November 4, 1996, prohibiting Defendant Sparks and his entities from using the words "bank" or "trust" in any business, letterhead, advertising, etc., soliciting or receiving investments or deposits or acting in any way like a bank.      Id.

On December 23, 1997, Defendant Sparks entered into a Stipulation and Order with California. The Stipulation and Order permanently enjoined activities relating to ANB and both Defendants [3] agreed to cease receiving or soliciting deposits in any bank and from using the words "bank" or "trust." Add. at 11-18. Defendant Sparks agreed to refund all funds obtained through the ANB operation and to send a letter to all of the victims of the scam stating:

> It is unlawful for any entity to carry on bank or trust operations, including the use of the name "bank" or "trust", without obtaining a license from an appropriate state or regulatory agency. No such license has been obtained. The alleged charter does not authorize these entities to operate as a bank or trust; nor does it authorize these entities to manage a bank or trust.

Id. at 13. No money was ever refunded to ANB investors. Tr. at 100.

By the time the Stipulation and Order was executed, however, Defendants had moved their operations to Oklahoma under the name of First Americans Trust

---

[3]Although Defendant Stephenson did not sign the Stipulation and Order, he concedes on appeal that he was bound by that document insofar as it prohibited the solicitation of deposits in any bank. Br. of Defendant Stephenson at 2.

Company or First Americans Bank ("FAB") and had been accepting and spending customer deposits there for approximately seven months. While the California action was pending, Defendants began negotiating with the Apache Tribe in Andarko, Oklahoma, about the possibility of opening a bank on Apache land. On May 20, 1997, Defendants caused the following press release to be posted on the internet:

> First Americans Trust Establishes
> OFF SHORE  BANKING  ON SHORE
>
> BRING THE MONEY HOME!
>
> First Americans Trust Company, a sovereign bank, and sovereign corporation authorized under the laws of the American Indians Nation, announces the opening of their main bank and financial service office at 620 E. Colorado, Andarko, Oklahoma. A spokesperson for the Bank stated, "we are now able to take deposits and open accounts.". . .
> . . . .
>
> The Bank offers preferential private banking services in the finest of offshore or Swiss banking traditions: client privacy and safety. Depositors and members of **First Americans** are able to avail themselves to **absolute banking privacy** . The bank also offers credit card and ATM services under the same privacy provision. Depositors [sic] accounts are insured with $200,000 per depositor.

Add. at 27.

At the time of the foregoing press release, however, Defendants were merely in negotiations with the Apache and no financial institution of any kind had yet been established. See, e.g., Tr. at 141, 143, 346-47, 663-66, 839-42. The

address given in the press release was that of a building belonging to the Apache in Andarko which housed the tribe's bingo hall and smoke shop.  Id. at 181-82. There never was a bank at that address.  Id.  Defendants hired an Apache woman to collect their mail that arrived there and forward it to their offices in Oklahoma City.  Id. at 129.  New account applications and deposits were processed in Defendants' Oklahoma City offices.  Depositors' checks were then sent via Federal Express to the Citizens Bank in Lawton, Oklahoma, and deposited into two accounts controlled by Defendants.  Id. at 471-78, 645.

During the operation of FAB, Defendants collected approximately $5.9 million in customer deposits.  Id. at 1135.  That money was spent as fast as it came in.  In a memo dated August 28, 1997, Brian Condon, the former president of FAB, advised Defendants:

> As you are aware the three of us have been spending funds rapidly for many reasons.  As I discussed with Owen today, we have exhausted our financial resources on deposit at Citizens Bank.  I should have just enough to cover payroll tomorrow, however, if a customer should call requesting a wire there will  not be funds available.

Add. at 30.  Every expense of FAB was paid with Depositor funds from the Citizens Bank accounts.  Tr. at 643.  Significant amounts of money were transferred or wired from those accounts to other accounts controlled by Defendants in the United States, Anguilla and Hong Kong, or to the accounts of Defendants' creditors.  Id. at 648-49, 658, 1139-44.  Moreover, FAB was never

-6-

capitalized, never earned money and never issued checks to its depositors.        Id. at 643, 647.  When depositors requested withdrawals, FAB used new depositor money to cover those requests.     Id. at 670.  Approximately $2 million of the $5.9 million collected by FAB from depositors was returned to them pursuant to withdrawal requests.

On May 8, 1998, the Securities and Exchange Commission ("SEC") filed suit against Defendants and their related entities.  The SEC also obtained a Temporary Restraining Order which froze,      *inter alia,*  Defendants' accounts at Citizens Bank in Lawton, Oklahoma.     Id. at 475, 704.  At the time of the freeze, those accounts held approximately $1.9 million.       Id. at 704.  That amount, for the most part, reflected the deposits of only one customer.       Id. at 1144-45.  Defendants were ultimately indicted, and their case proceeded to trial in April 1999.

At trial, Defendants called Patrick Walters, an accountant, as an expert witness.  The purpose of his testimony was to establish that NAFTA, the holding company that owned 48% of FAB, had access to sufficient capital, by virtue of its ownership of numerous interlocking entities related to Defendants, to cover the deposits received by FAB.     Id. at 1244.  After Walters testified for some time, it became apparent that his conclusion about the solvency of NAFTA and the other entities, and their relationship to FAB, was based entirely on his examination of

unauthenticated documents provided to him by the defense.     Id. at 1237-43.  The authenticity of the documents Walters relied upon, as well as their relevance, was the subject of an evidentiary hearing held during trial on April 27, 1999.  The district court excluded any further testimony by Walters on the following grounds: (1) the testimony and the documents on which it was based were unreliable, and (2) the information about NAFTA contained in the documents and in Walters' testimony was irrelevant because it established no obligation of NAFTA to FAB. Id. at 1394-98.  Two days later, the jury found Defendants guilty on all counts.

Following the jury verdict, but prior to sentencing, allegations of misconduct arose with respect to Christy Hulsey, one of the jurors at Defendants' trial.  The source of these allegations, at first anonymous, was discovered to be James Hulsey, Ms. Hulsey's disgruntled ex-husband-to-be.  Mr. Hulsey made various outrageous claims regarding his wife's role as a juror which he later admitted were false.  Tr. 7/12/99 at 8, 13, 17.  However, he claimed he was telling the truth when he said that she had spoken with a friend of hers about the trial. That friend is the daughter of a lawyer who represented Stephen Marler, a witness for the government at Defendants' trial.

Despite the fact that Mr. Hulsey admitted fabricating all but one of the allegations, the district court held an in-camera conference on July 12, 1999, and a hearing on August 19, 1999.  At the hearing, the court questioned Ms. Hulsey.

She admitted telling her friend that she was a juror in this case, but denied discussing the case with her friend and stated that no extraneous influence had been exerted upon her. Tr. 8/19/99 at 3-5. The district court was satisfied and denied Defendants' request to investigate the matter further     Id. at 8. The case then proceeded to sentencing.

On October 7, 1999, Defendant Sparks was sentenced to 135 months in prison. Defendant Stephenson was absent from the sentencing hearing, due to purported heart trouble. He also missed the rescheduled hearing the following week and was arrested some eight months later, claiming that he spent his time as a fugitive trying to make restitution to his victims. However, the fact that he was arrested with appearance altering items and $30,000 in cash suggests he may have had other plans. Finally, on July 7, 2000, after the district court rejected Defendant Stephenson's objections to the amount of loss attributed to him, he was sentenced to 151 months in prison. Defendants were also ordered, jointly and severally, to make restitution to their victims in the amount of $6,862,494. These appeals followed.

## II. DISCUSSION

### A. Expert Testimony

Expert testimony will be admitted if it will assist the trier of fact to understand the evidence or determine a fact in issue. Fed. R. Evid. 702. An expert may base his opinion on information made known to him and, if of a type reasonably relied upon by other experts in his field, on evidence that would not otherwise be admissible. Fed. R. Evid. 703. The district court has been charged by the Supreme Court with the responsibility of acting as a gatekeeper to exclude unreliable and irrelevant expert testimony. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993) ("trial judge is assigned the task of insuring that an expert's testimony rests on a reliable foundation and is relevant"); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); Macsenti v. Becker, 237 F.3d 1223, 1231 (10th Cir. 2001).

As indicated above, the district court, after holding an evidentiary hearing, found the documents relied upon by Mr. Walters and his testimony based thereon to be unreliable and irrelevant. Defendants argue that the court erred in so doing because the documents Walters relied on were of the type reasonably relied on by other accounting experts and because the solvency of NAFTA and the entities under its control was directly relevant to the issue of intent. The district court enjoys broad discretion when determining the reliability and relevance of expert

testimony and we review its exclusion of Walters' testimony only for an abuse of that discretion. Kumho Tire Co., Ltd. , 526 U.S. at 158; United States v. Charley , 189 F.3d 1251, 1261 (10th Cir. 1999).

### 1. Reliability

After allowing Walters to testify at some length regarding NAFTA and the entities it owned, the district court became concerned about the authenticity of the documents upon which Walters was relying. The court stated:

> I'm satisfied his testimony is truthful . . . but they could have created these documents the day before. . . . My concern is about him testifying about how NAFTA is arranged and all the ownership of all these various corporations and trusts. He just doesn't have that knowledge, other than what he has seen.

Tr. at 1255. Mr. Pointer, Defendant Stephenson's counsel, acknowledged, "I certainly can't establish the authenticity through [Walters]." Id. at 1256. The only evidence of authenticity came in the form of Defendant Stephenson's testimony at the evidentiary hearing that he created one of the trust documents in question. Aside from being self-interested, that testimony did not go to the validity of the document or the trust it purported to create. Indeed, one of the district court's concerns was that Defendants had fabricated the documents. Id. at 1255.

Defendants focus on Fed. R. Evid. 703.  Defendant Sparks, in his Reply Brief, states that the government's reliance on Daubert and Kumho Tire is misplaced because those cases deal with Rule 702, not Rule 703.  Defendants seem wrongly to believe that expert testimony can be admitted under Rule 703 alone, even if it violates Rule 702.  Rule 702 is the gatekeeping rule.  It is meant to exclude, as a preliminary matter, expert testimony that is irrelevant and/or unreliable.  We recognize that the types of documents given to Walters, if authentic and truthful, were of the type normally relied on by accountants.[4] Because there was no indication of authenticity, however, Walters' testimony, which was based on those documents, did not "rest on a reliable foundation" and had to be excluded under Rule 702.  Daubert, 509 U.S. at 597.

## 2.  Relevance

Walters testified that there was nothing in any of the documents provided to him by the defense that established any obligation or contractual duty of NAFTA or any of the entities it owned to pay the debts or cover the customer deposits of

---

[4]At the evidentiary hearing, the district court stated "I don't think – given the history of them, I don't think they're the type of documents an expert can reasonably rely on." Tr. at 1398.  While it could appear that the court was invoking Rule 703, we think the court was trying to say that unauthenticated and possibly fake documents cannot be reasonably relied upon by experts, not that expert accountants cannot reasonably rely on brokerage statements, trust documents, balance sheets and the like.

FAB. Id. at 1395. Accordingly, the district court found the documents purporting to show the value of various NAFTA-owned entities and the expert testimony that was going to be drawn therefrom to be irrelevant to the issue of whether Defendants fraudulently obtained money. We agree with the district court.

If NAFTA had no obligation to back FAB, placing money into NAFTA or the entities it owned is no different than placing it in a personal checking account. Defendants controlled NAFTA and all of the entities it owned. None of the so-called investments by FAB in NAFTA-owned entities were in FAB's name or were made pursuant to any contractual agreement with FAB. Such investments consisted largely of acquisitions of securities of other entities controlled by Defendants. In other words, the money from FAB that found its way into NAFTA or its related entities was either invested in or held by entities or in accounts controlled by Defendants. That is just where one would expect to find fraud proceeds that had not been immediately spent by the perpetrators.

In essence, Defendants asked the jury, and now ask this court, to trust them to cause the liquidation of their other assets and to transfer funds through their various interrelated entities and accounts back to FAB if the need arises. Even if we did trust them to cover FAB's deposits and expenses, which we do not, that would not be enough to prove that NAFTA or any other entity under their control,

has any obligation to do so. [5] Accordingly, the value and solvency of NAFTA is irrelevant to the fraud perpetrated through FAB.

After carefully reviewing the record, we conclude that the district court properly performed its gatekeeping duties under Daubert and Kumho Tire and did not abuse its discretion by excluding Walters' testimony as unreliable and irrelevant. [6]

## B. Juror Misconduct

"How and whether to have a hearing on a claim that jurors were improperly exposed to extraneous information is within the trial court's sound discretion." United States v. Humphrey, 208 F.3d 1190, 1998 (10th Cir. 2000). If a hearing is held, "a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention," but "a juror may not

---

[5]We do not think that fraudulent intent is disproven just because the perpetrator places the money in accounts or entities under his control or uses the money to purchase identifiable assets and then claims at trial that he would, if the need ever arose, liquidate those assets and empty those accounts and entities in order to make his victims whole.

[6]Despite the fact that the district court eventually excluded Walters' testimony, it allowed him to testify at length prior to the evidentiary hearing. Based on the documents later found unreliable and irrelevant, Walters testified before the jury as to the various entities owned by NAFTA, including FAB, and even stated that NAFTA's liquid asset value was $6,611,791.08. Tr. at 1247.

-14-

testify as to . . . the effect of anything . . . concerning the juror's mental processes in connection therewith." Fed. R. Evid. 606(b). In other words, "[t]he court's questioning of a juror who is the recipient of extraneous information is limited to the circumstances and nature of the improper contact." United States v. Simpson, 950 F.2d 1519, 1521 (10th Cir. 1991) (quotation omitted).

Defendants believe that the hearing on juror misconduct held by the district court was insufficient. They argue that the district court should have investigated further and held a "full hearing" at which Mr. and Ms. Hulsey, Ms. Hulsey's friend and others could have been examined and cross-examined and at which other evidence could have been introduced. We review the district court's actions for an abuse of discretion. Humphrey, 208 F.3d at 1998.

The district court had before it Mr. Hulsey's allegation that Ms. Hulsey had discussed the case with her friend. Ms. Hulsey denied the allegation at the juror misconduct hearing. Given the fact that Mr. Hulsey admitted that he had lied about all of the other allegations involving his wife, the district court reasonably considered Ms. Hulsey to be the more credible party and determined that there had been no juror misconduct. After reviewing the matter carefully, we conclude that the district court had no credible evidence that Ms. Hulsey had been exposed to extraneous information or influence and was, therefore, well within its

-15-

discretion in refusing to pursue the matter through additional hearings or otherwise.

Defendants argue that "[t]here is no question but that Mr. H[ulsey]'s account to the [sic] agent Michalko was a presumption of prejudice was [sic] created." Br. of Defendant Stephenson at 16. We believe Defendants are trying to say that Mr. Hulsey's allegations created a presumption of prejudice under Remmer v. United States, 347 U.S. 227 (1954). Indeed, "[t]he law in the Tenth Circuit is clear. A rebuttable presumption of prejudice arises whenever a jury is exposed to external information in contravention of a district court's instructions." United States v. Davis, 60 F.3d 1479, 1484-85 (10th Cir. 1995) (quotation omitted). What Defendants fail to see is that in order for the presumption to arise, there must be evidence that the jury was exposed to external information. Here, the district court found, after holding a conference and a hearing on the matter, that there was no such exposure. We are unable to evaluate the harmlessness of an event that did not occur.[7]

---

[7]In any event, the overwhelming evidence of Defendants' guilt would likely result in our finding the alleged exposure to be harmless. Davis, 60 F.3d at 1485.

## C. Sentencing

The district court determined at sentencing that the intended loss in this case was approximately $8.7 million. Accordingly, Defendants were sentenced under U.S.S.G. §2F1.1(b)(1)(O), which provides that the base offense level of six is increased by fourteen levels where the loss exceeds $5 million, but is less than $10 million. The commentary to §2F1.1 provides some guidance as to the definition of loss for purposes of sentencing: "[L]oss is the value of the money, property, or services unlawfully taken." U.S.S.G. § 2F1.1, comment. (n.8). Moreover, "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss."      Id.

Defendant Stephenson argues that the district court incorrectly determined the amount of loss under the guidelines and declares that the true amount of loss attributable to him is only $3.9 million because (1) the approximately $2 million that FAB depositors actually managed to "withdraw" should not be included in the amount of loss, and (2) the $2.8 million raised by ANB through its stock offering and other activities should not be included in the amount of loss because the evidence was insufficient to show that he was involved in that scam. He must prevail on both arguments in order to drop below the $5 million threshold and obtain a one level reduction in his total offense level. We review the district

court's factual findings for clear error and its overall application of the guidelines de novo. United States v. Cantley, 130 F.3d 1371, 1378 (10th Cir. 1997).


**1. Inclusion of Amounts "Withdrawn"**

In United States v. Burridge, 191 F.3d 1297 (10th Cir. 1999), we dealt with a defendant who was entrusted with real estate sales proceeds from taxpayers seeking to comply with the like-kind exchange rule of the Internal Revenue Code in order to avoid capital gains taxes on those sales. Id. at 1300. Burridge was supposed to hold his victims' funds until they located and purchased another like-kind property. However, he began using those funds for personal expenses and to cover closing costs on other real estate transactions. Id. Some victims recovered some of their money prior to indictment, but the court found the entire amount entrusted to Burridge to be the intended loss despite his claims that he never intended to cause any loss to anyone and over his objections that the intended loss should be limited to the net loss. Id. at 1300-1301.

We declined to adopt the "net loss" approach and rejected his claims of error. Instead, we stated that "the calculation of intended loss under U.S.S.G. § 2F1.1 incorporates a determination of the defendant's intent, which is a question of fact for the sentencing court." Id. at 1300. We also noted that

Burridge's conduct of using new client funds to cover the closings of prior clients, conduct very similar to using new depositor money to cover existing depositor withdrawal requests, was "materially different from the conduct we found insufficient to support application of an intended loss theory in [ United States v. Smith , 951 F.2d 1164 (10th Cir. 1991)]," a case upon which Defendant Stephenson mistakenly relies.  Burridge , 191 F.3d at 1303.

The reasoning in Burridge controls here.  Defendants used new depositor money to cover withdrawal requests made by existing depositors.  They did not return to a depositor the money he had put on deposit with the bank, but rather that of someone else. [8]  Accordingly, Defendants did no more than shift the loss from the depositor requesting withdrawal to the new depositor whose money was used to cover that request.  Moreover, granting withdrawal requests was necessary for the perpetuation of the scheme because it gave the illusion that all was legitimate and well at FAB.

_____

[8]We understand that banks place depositor funds in a common pool, some of which is invested, some of which is lent and some of which is retained to cover withdrawal requests.  Of course, when a depositor withdraws money from a bank, he will not receive the actual money he put in.  However, in this case, the loss shifting analysis applies because Defendants spent or appropriated depositor money as fast as it came in.  Therefore, they had to use new deposits to cover everything, including existing depositor withdrawal requests, because FAB had no other assets.

At sentencing, the district court found the entire amount of money raised by ANB and FAB was the intended loss:

> [A]s far as I'm concerned, this entire thing was a fraud. It's about as much of a sham and a scam as any I have seen. And the fact that some people happened to get their money back, I'm satisfied that was necessary to keep up the charade or keep the fraud going. And the intended loss is the entire amount that was deposited or invested in this preposterous scheme.

Tr. 7/7/2000 at 67. After reviewing the record, we conclude that the district court's findings as to Defendants' intent and its inclusion of the $2 million actually withdrawn by victims in the total intended loss amount were not clearly erroneous.

## 2. Inclusion of the $2.8 Million Raised By ANB

Although our conclusion with regard to the $2 million "withdrawn" by depositors prevents the loss attributable to Defendant Stephenson from falling below the $5 million threshold, the issue of money raised through ANB, whether viewed alternatively or additionally, supports the conclusion that the district court did not err in applying the guidelines.

At Defendant Stephenson's sentencing hearing, Agent James Adams summarized the evidence connecting Defendant Stephenson to ANB. On April 20, 1996, Defendant Sparks wrote a check from ANB to Cherokee Trust, a

trust for which Defendant Stephenson was trustee, for $50,000. Tr. 7/7/2000 at 14. Cherokee Trust was the entity that purchased, on behalf of ANB, the 1905 charter mentioned in its Private Placement Memorandum. Id. at 13. On October 28, 1996, Defendant Stephenson authored a letter on ANB letterhead to a partner of Coopers & Lybrand regarding the establishment of ANB Limited in Barbados. Id. at 11. Finally, although Defendant Stephenson was not named in the suit California brought against ANB, he was deposed in connection therewith and was understood to be the other person involved with Defendant Sparks in raising money for ANB. Tr. at 96.

At sentencing, Defendant Stephenson testified that he was completely uninvolved in ANB. Tr. 7/7/2000 at 49-51. The district court did not find his testimony to be credible:

> I find the testimony of Mr. Stephenson entirely unbelievable and incredible. I just – I really wouldn't believe anything Mr. Stephenson has to say. He's got such a track record of lies and fraud that I just don't find him a credible witness at all.
> I'm satisfied he was involved with ANB. He was convicted by the jury of Count 1, which included the 2.8 million in California and Florida transactions under ANB. And the summary of the testimony by Agent Adams, I think, clearly shows that he was imminently involved in that fraud and deception as well as the fraud and deception here in Oklahoma . . . .

Id. at 68. We agree with the district court and find no error in its inclusion of the $2.8 million raised through ANB in the amount of intended loss attributable to Defendant Stephenson.

**D. Arguments Raised in Defendant Sparks' Pro Se Brief**

We allowed Defendant Sparks to file a pro se Supplemental Appeal Brief. In that filing, he claims that: (1) the district court abused its discretion by denying his counsel's motion to withdraw and his motions for continuance and thereby violated his right to effective assistance of counsel; (2) the district court abused its discretion by denying his motion to declare a mistrial; (3) the district court abused its discretion by adding a two level enhancement for committing the instant offense while on probation and by adding a five level enhancement based on the value of laundered funds; (4) the district court abused its discretion and violated his due process rights by denying his pretrial motions without consideration; and (5) the cumulative error doctrine should be applied on appeal.

Defendant Sparks claims that his counsel at trial did not have enough time to prepare for the case because the district court refused to continue the trial date and would not permit withdrawal. He argues that as a result of the district court's actions, his Sixth Amendment right to effective assistance of counsel was

violated.  It is not clear whether he is raising a due process challenge together with his ineffective assistance of counsel claim.  We have, however, examined the record and determined that the district court did not abuse its discretion or violate Defendant Sparks' due process rights by denying his motions to continue or his counsel's motion to withdraw.  His ineffective assistance of counsel claim should be brought in collateral proceedings, specifically under 28 U.S.C. § 2255, and not on direct appeal.   See United States v. Galloway  , 56 F.3d 1239, 1240-42 (10th Cir. 1995) (en banc).  Accordingly, we decline to address that claim here.

Next, Defendant Sparks argues that the district court erred by denying his motion for a mistrial on the second day of trial.  In the motion, he argued that a news report which stated that he had contact with certain anti-government factions, combined with the fact that his trial began on the anniversaries of the Waco fire and the Oklahoma City federal building bombing, was so prejudicial that he could not possibly obtain a fair trial.  In response to the motion, the district court asked the jury if any of them had "read or listen[ed] to anything about this case outside the courtroom after we recessed last night?"  Tr. at 153.  The record reflects that all responded negatively.     Id.  As to the start date of the trial, we think any claim of prejudice in this matter from the commencement of the trial on the aforementioned anniversaries is meritless as purely speculative

and conclusory. Having found no evidence of prejudice, we conclude that the district court did not abuse its discretion by denying Defendant Sparks' motion for a mistrial.

Two points were added to Defendant Sparks' criminal history category score because he committed the present offense while on probation. U.S.S.G. § 4A1.1(d). He argues that because he was placed on probation on May 27, 1997, some thirteen months after the conduct for which he was tried in this case commenced, the addition to his criminal history score was error. However, the criminal conduct for which he was charged in this case was still ongoing when he was placed on probation and continued for nearly another year. The guidelines specifically state, "[t]wo points are added if the defendant committed _any part_ of the instant offense ( _i.e.,_ any relevant conduct) while under any criminal justice sentence, including probation . . . ." U.S.S.G. § 4A1.1(d) comment. (n.4) (emphasis added). That language clearly covers this situation. The two point addition was properly made.

Defendant Sparks next challenges the five level increase in his offense level made pursuant to U.S.S.G. § 2S1.1(b)(2)(F). He argues that since he was only indicted for laundering $82,000, that figure must also be used for sentencing. However, the law is to the contrary:

[U.S.S.G. §1B1.3] Subsection (a)(2) provides for consideration of a broader range of conduct with respect to . . . certain property, tax, fraud and drug offenses for which the guidelines depend substantially on quantity . . . . Thus, in an embezzlement case, for example, embezzled funds that may not be specified in any count of conviction are nonetheless included in determining the offense level if they were part of the same course of conduct or part of the same scheme or plan as the count of conviction.

U.S.S.G. §1B1.3(a)(2) comment. (n.10). Money laundering is covered by §1B1.3(a)(2), and the commentary above is directly applicable to that crime.    See U.S.S.G. §3D1.2(d).

The government must prove the amount laundered at sentencing. If they carry their burden of proof, the amount is properly considered when determining the offense level even if not specified in any count of conviction. At Defendant Sparks' sentencing, the district court specifically stated, "I do find the government has borne its burden of proof that $1.3 million was indeed laundered, that all of this was the product of fraud, as found by the jury." Tr. 10/7/1999 at 194. After reviewing the record, we conclude that it supports the court's finding. We therefore hold that the district court did not err in increasing Defendant Sparks' offense level by five levels.

In support of his claim of denial of due process, Defendant Sparks states that the district court denied some of his motions without comment. He then launches into a tirade against this court and other government officials for

allegedly altering constitutional law from the form intended by the framers. We note that just because the district court did not explain its rulings in writing does not mean that it did not consider the motions. We find nothing of merit in any of Defendant Sparks' contentions regarding his due process claim, and, as a result, conclude that the district court did not err in denying the motions in question, with or without explanatory commentary.

Finally, because we conclude that the district court did not err in any regard, the cumulative error doctrine is inapplicable. See United States v. Rivera, 900 F.2d 1462, 1470-71 (10th Cir. 1990) (en banc).

### III. CONCLUSION

For the foregoing reasons, we AFFIRM Defendants' convictions and sentences.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge